IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| FARM BUREAU LIFE INSURANCE COMPANY and FARM BUREAU MUTUAL INSURANCE COMPANY, <br><br> Plaintiffs, <br><br><br> vs. <br><br> AMERICAN NATIONAL INSURANCE COMPANY, AMERICAN NATIONAL GENERAL INSURANCE COMPANY, AMERICAN NATIONAL PROPERTY & CASUALTY COMPANY, KENNETH GALLACHER, and DARRIN IVIE, <br><br> Defendants. | ORDER <br> AND <br> MEMORANDUM DECISION <br><br><br> Case No. 2:03-CV-00646 TC |
| DARRIN IVIE, <br><br> Counterclaim Plaintiff, <br> vs. <br> FARM BUREAU LIFE INSURANCE COMPANY and FARM BUREAU MUTUAL INSURANCE COMPANY, <br><br> Counterclaim Defendants. | |

Plaintiffs Farm Bureau Life Insurance Company and Farm Bureau Mutual Insurance

Company (collectively "Farm Bureau") claim that Darrin Ivie (an agency manager for Farm

Bureau), American National Insurance Company ("American National"), and Kenneth Gallacher

(regional director for American National), conspired to entice Farm Bureau agents to leave Farm

Bureau to work for American National.  Farm Bureau maintains that Mr. Ivie, Mr. Gallacher, and

American National knew that these agents had signed contracts with Farm Bureau that contained

a non-solicitation provision.

In Farm Bureau's Third Amended Complaint, Farm Bureau asserts the following causes of action: (1) Breach of Duty of Loyalty, (2) Breach of Fiduciary Duty, (3) Inducing the Breach of Fiduciary Duty and Duty of Loyalty, (4) Misappropriation of Trade Secrets, (5) Tortious Interference with Present and Prospective Contractual Relationships, (6) Tortious Interference with Present and Prospective Business Relations or Economic Advantage, (7) Business Disparagement, (8) Trade Libel and Injurious Falsehood, (9) Defamation, (10) Civil Conspiracy, (11) Respondeat Superior, (12) Unfair Competition, (13) Unjust Enrichment, and (14) Injunction.

This matter comes before the court on several motions for partial summary judgment. Defendants American National Insurance Company, Darrin Ivie, and Kenneth Gallacher (collectively "American National"), filed four motions for partial summary judgment regarding: Interpretation of the Non-Solicitation Provision, Misappropriation of Trade Secrets, claims for Breach of Fiduciary Duty and Duty of Loyalty and Inducing Breach of Duty, and claims for Business Disparagement, Trade Libel, Injurious Falsehood, and Defamation.[1]  Farm Bureau filed a motion for summary judgment seeking to have Defendant Ivie's Counterclaims dismissed.

After reviewing the relevant court filings and considering the oral argument offered by the parties, the court ORDERS as follows.  First, because Farm Bureau and Mr. Ivie are in settlement negotiations, Farm Bureau's motion regarding Ivie's Counterclaims is DENIED WITHOUT PREJUDICE.  Second, because the issue of the interpretation of the non-solicitation provision will be decided when jury instructions are finalized, American National's motion for partial summary judgment regarding the Interpretation of the Non-Solicitation Provision is

---

[1] Defendants American National Property and Casualty Company and American National General Insurance Company joined American National's motions.

DENIED WITHOUT PREJUDICE. Third, American National's motion for partial summary judgment regarding Farm Bureau's claims for Misappropriation of Trade Secrets is DENIED because Farm Bureau has raised genuine disputes of material facts. Fourth, American National's motion for partial summary judgment regarding Farm Bureau's claims for the Breach of Fiduciary Duty and Duty of Loyalty and Inducing Breach of Duty is DENIED because Farm Bureau has raised genuine disputes of material facts. Fifth, because Farm Bureau has failed to allege any damages and none of the alleged statements can sustain a libel or slander *per se* claim, American National's motion for partial summary judgment concerning the claims for Business Disparagement, Trade Libel, Injurious Falsehood, and Defamation is GRANTED.

## FACTUAL BACKGROUND

The factual background is set forth at length in the written submissions of the parties. The court will repeat only those facts necessary to explain its decision. In light of the standard governing summary judgment motions, the following factual exposition is largely confined to material that the parties do not dispute. Any disputed facts, or facts derived from challenged evidentiary sources, are identified and are either not considered or resolved in favor of the nonmoving party.

**I. Mr. Darrin Ivie**

Mr. Darrin Ivie worked for Farm Bureau from 1987 through February 2003. In 1987, Mr. Ivie became a sales agent for Farm Bureau and continued in that role until 1990. From 1990 to 1995, he worked for Farm Bureau as an Assistant Agency Manager and was later promoted to Agency Manager. In 1995, he left Farm Bureau for a short time to pursue other employment. In 1996, Mr. Ivie resumed working for Farm Bureau and held the position of an Assistant Agency Manager and later became the Agency District Manager for Farm Bureau in southern Utah. He

was in charge of Farm Bureau's Zion Cove Agency and was responsible for recruiting and supervising insurance agents.  Mr. Ivie supervised agents and "agents-in-training," whom he was training to become Farm Bureau agents.

Farm Bureau agents are required to sign Career Agent Contracts, which contain non-solicitation clauses.  The non-solicitation clauses prohibit agents from soliciting or initiating customer contact for the purpose of selling a customer a replacement policy for a period of one year upon termination of the Career Agent Contract.

As early as June 2002, Mr. Ivie had contact with Mr. Ken Gallacher.  Mr. Gallacher is a Regional Director for American National, a direct competitor of Farm Bureau.  During the time that Mr. Ivie worked for Farm Bureau, he attended meetings with various representatives of American National and had on-going e-mail communications with Mr. Gallacher.

## II.     The Meeting in Fillmore, Utah

In early 2003, Ms. Heather Erickson (a former Farm Bureau "agent-in-training" who became an agent for American National in December 2002) sent postcards to local farmers, inviting them to attend a meeting in Fillmore, Utah.  American National held the meeting to discuss its new venture into the farm insurance market.  Farm Bureau claims that an American National representative made disparaging and defamatory statements about Farm Bureau to those at the meeting.  Mr. Garth Swallow, a Farm Bureau customer who attended the meeting, gave the only testimony regarding the alleged statements made at this meeting.

## III.    The Fallout

On February 14, 2003, Mr. Ivie sent an e-mail to his supervisor, Larry Riley, stating that he was resigning from Farm Bureau effective February 28, 2003.  On March 1, 2003, Mr. Ivie started working for American National.

4

Several of the agents who worked under Mr. Ivie left Farm Bureau at about the same time that Mr. Ivie left.  The agents or agents-in-training who left American National (and their dates of resignation) are: Grant Stubbs (November 1, 2002), Heather Erickson (December 2002, agent-in-training), Tim Vensel (December 31, 2002), Kevin Whisenant (January 17, 2003), Laynce Bartruff (February 14, 2003), Robert Wells (February 14, 2003), Dale Ure (February 14, 2003), Don Wells  (February 24, 2003), Brooke Bartruff (March 4, 2003, agent-in-training), and Ken Lefevre (March 2003, agent-in-training).

On July 23, 2003, Farm Bureau filed this lawsuit against American National, Mr. Gallacher, and Mr. Ivie.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The non-movant must set forth "specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-movant]."  Liberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing

Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

"Summary judgment is a drastic remedy [and] and any relief pursuant to Fed. R. Civ. P. 56 should be awarded with care." Conaway v. Smith, 853 F.2d 789, 792 n.4 (10th Cir. 1988) (citing Jones v. Nelson, 484 F.2d 1165, 1168 (10th Cir. 1973)). "Unless the moving party can demonstrate his entitlement beyond a reasonable doubt, summary judgment must be denied." Id. (citing Norton v. Liddel, 620 F.2d 1375, 1381 (10th Cir. 1980)).

## ANALYSIS

### I.     The Interpretation of the Non-Solicitation Provision

As the court explained at oral argument, the court will address this question at the time jury instructions are finalized.  Accordingly, American National's motion for summary judgment is denied without prejudice.

### II.     Misappropriation of Trade Secrets

Farm Bureau alleges that American National misappropriated a number of its trade secrets.  Farm Bureau claims that the following are trade secrets that American National misappropriated: (1) customer lists, (2) Farm Bureau books of business, (3) information relating to Farm Bureau insurance agents' compensation and commission rates, (4) the success of the agents in soliciting and retaining insurance customers, (5) the identity of the Farm Bureau agents that are top producers, and (6) the terms of Farm Bureau's Career Agent Contracts, including information about which agents were under a non-solicitation provision with Farm Bureau.

Farm Bureau contends that Mr. Ivie had access to Farm Bureau's trade secrets and that Mr. Ivie secretly shared this information with Mr. Gallacher to effectuate American National's *en masse* hiring of Farm Bureau's best agents in the southern Utah area.

American National maintains that it is entitled to summary judgment because Farm Bureau's claimed trade secrets are not legally protectable under Utah law because Farm Bureau did not use reasonable efforts to protect the secrecy of its claimed trade secrets and that Farm Bureau has no evidence that any of the Defendants misappropriated its claimed trade secrets.

Under the Utah Uniform Trade Secrets Act, to succeed on its claim Farm Bureau must prove: (1) the existence of a trade secret, (2) communication of the trade secret under an express duty not to disclose or use it, and (3) defendants' use of the secret that injures plaintiff.  See Water & Energy Sys. Tech., Inc. v. Keil, 974 P.2d 821, 822 (Utah 1999).

A.    Trade Secret

The threshold inquiry into a claim of the misappropriation of trade secrets is whether a trade secret even exists.  Under the Utah Uniform Trade Secrets Act, a trade secret is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code Ann. § 13-24-2(4) (2005).  The burden of establishing the existence of a trade secret is the plaintiff's, and there is no presumption in plaintiff's favor.  Microbiological Research Corp. v. Muna, 625 P.2d 690, 696 (Utah 1981); Utah Med. Prods. Inc. v. Clinical Innovations Assocs., Inc., 79 F. Supp. 2d 1290, 1311 (D. Utah 1999).

In its motion, American National contends that Farm Bureau did not take reasonable steps to maintain the secrecy of its claimed trade secrets.

American National argues that Farm Bureau's books of business, which includes

customer lists, were readily accessible by the Farm Bureau agents, in electronic and hard-copy form, and when printed in hard-copy form, were not marked confidential.  American National further claims that the Farm Bureau agents were not required to sign a confidentiality or non-disclosure agreement, and that there is no provision in the Career Agent Contracts that contains an express "confidentiality" or "non-disclosure" provision.

But Farm Bureau has pointed to evidence that it did take extensive measures to ensure that the names of its customers were kept private.  For example, Farm Bureau has provided evidence that it gave extensive training to its employees and agents on what constituted confidential information.  Mr. Chris Van Note, who was designated as Farm Bureau's 30(b)(6) witness, testified that Farm Bureau provided an online training course to Farm Bureau agents and employees concerning Farm Bureau's privacy policy toward customer information.  Farm Bureau also created an educational privacy video addressing Farm Bureau's privacy policy concerning customer information.  This video was sent to all Farm Bureau managers to share with their agents.

Moreover, Farm Bureau did require employees, including Mr. Ivie, to sign a confidentiality agreement.  The confidentiality agreement instructed that during the course of employment, an agent may use or have access to personal, financial, and medical information concerning Farm Bureau's members, Farm Bureau insureds, applicants for insurance, and Farm Bureau's employees.  And that all such information, not generally known to the public, must be treated as confidential.  Also, Farm Bureau's Career Agent Contracts expressly provide that the Accounts and Records of Farm Bureau are confidential.

American National claims that Farm Bureau did not take reasonable steps to maintain the secrecy of its agents' personal information, including who was a top producer for the company.

American National takes the position that because this information is confidential in only *some circumstances,* that alone demonstrates that such information is not a trade secret.  American National also contends that Farm Bureau did not take reasonable steps to maintain the secrecy of its top producers because, for example, if a Farm Bureau agent wins a prize, like a trip to Cancun, or receives a recognition plaque for winning a contest for production levels, that information is not confidential.

In response, Farm Bureau has shown that its confidentiality agreement prohibits agents from using confidential information regarding Farm Bureau's members, employees, and customers.  Further, Mr. Dell Johnson, a Farm Bureau agent, testified that Farm Bureau's computers were password protected and one Farm Bureau agent could not gain access to another agent's book of business or commission statement.

Given this evidence, the court concludes that Farm Bureau has raised genuine disputes of material fact regarding whether it took reasonable steps to maintain the secrecy of its alleged trade secrets.

B.      Misappropriation of the Claimed Trade Secrets

Under Utah law, the term misappropriation means:

(a) acquisition of a trade secret of another by a person who knows or who has reason to know that the trade secret was acquired by improper means; or

(b) disclosure or use of a trade secret of another without express or implied consent by a person who:

        (I) used improper means to acquire knowledge of the trade secret; or

        (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
                (A) derived from or through a person who had utilized improper means to acquire it;
                (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

>           (C) derived from or through a person who owed a duty to the
>           person seeking relief to maintain its secrecy or limit its use or

>      (iii) before a material change of his position, knew or had reason to
>      know that it was a trade secret and that knowledge of it had been
>      acquired by accident or mistake.

Utah Code Ann. § 13-24-2(2) (2005).  The term "improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy . . . "  Id. § 13-24-2(1).

American National claims that Farm Bureau has no evidence that American National misappropriated any of Farm Bureau's alleged trade secrets.  American National relies, in part, on the testimony of Farm Bureau's 30(b)(6) deponent Gary Harms.  In his deposition, Mr. Harms testified that he was not aware of any information in the possession of Farm Bureau that indicates that American National misappropriated any Farm Bureau customer lists.

But there is evidence that indicates that American National misappropriated Farm Bureau's trade secrets.  For instance, on December 22, 2002, Mr. Gallacher sent an e-mail to Mr. Pakulski,  Director of Business Development at American National, stating, "Robert Wells is currently one of the leading life agents at Iowa Farm Bureau.  He is currently working on a charitable lead trust for January and the premium is 1.2 million in life premium; however, with us because we do not have single premium whole life it would be $130,000 in life premium and a 1 million dollar annuity."  (E-mail from Mr. Gallacher to Mr.  Pakulski (Dec. 22, 2002), attached as Ex. 15 to Pls.' Mem. in Opp'n of Defs.' Mot. for Partial Summ. J. With Respect to Pls.' Claims for Misappropriation of Trade Secrets ("Pls.' Opp'n Mem. to Misappropriation of Trade Secrets").)

In December 2002, Mr. Kevin Whisenant (who was a Farm Bureau agent at the time he sent this e-mail) sent Mr. Terry Cochran of American National an e-mail containing confidential

information pertaining to Farm Bureau's clients.  In his e-mail, Mr. Whisenant asked Mr.

Cochran, "[i]f you or someone else has time, could you run a comparison on the three attached

clients?  They are very basic and so they should be fairly easy.  After the training next week, I

should be able to run some comparisons on more complex clients to see if we are competitive."[2]

(E-mail from Mr. Whisenant to Mr. Cochran (Dec. 10, 2002), attached as Ex. 12 to Pls.' Opp'n

Mem. to Misappropriation of Trade Secrets.)  Attached to Mr. Whisenant's e-mail were three

pages of confidential client information.  (Id.)

On January 17, 2003, Mr. Gallacher informed Mr. Pakulski that "We are trying to bring

everyone over in the next couple of months.  Both Robert and Don did over 100 lives last year.

Right now, Robert is visiting with Wayne Cucco on a $250,000 ten year whole life on our new

whole product. Darren [sic] Ivie is working with Wayne on a 21 million dollar annuity, it would

be 100 million but that is to[o] big so we will be getting only 1 piece of the pie.  This is the type

of business that the agri-business generates as Phil Weber can attest to."  (E-mail from Mr.

Gallacher to Mr. Pakulski (Jan. 17, 2003), attached as Ex. 18 to Pls.' Opp'n Mem. to

Misappropriation of Trade Secrets.)

Also, on January 22, 2003, Mr. Gallacher wrote an e-mail to Mr. Ostergren, an Executive

Vice President at American National, stating, "Robert [Wells, who at the time was a Farm

Bureau agent] is already visiting with Wayne Cucco on a $298,000 a year estate planning case.

All three of the brothers are working on this case and others like it."  (E-mail from Mr. Gallacher

---

[2] American National claims that this evidence is inadmissible hearsay.  But this is not
hearsay because it is not being offered for the truth that the customer's records were attached, but
rather it is offered for the fact that it was sent.  "If the significance of an offered statement lies
solely in the fact that it was made, no issue is raised as to the truth of anything asserted."  5 Jack
B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.11[1] (Joseph M.
McLaughlin ed., 2d ed. 2007).

to Mr. Ostergren (Jan. 22, 2003), attached as Ex. 17 to Pls.' Opp'n Mem. to Misappropriation of

Trade Secrets.)

Based on the above quoted communications, a reasonable jury could find that Farm

Bureau's claimed trade secrets had been misappropriated.  Accordingly, summary judgment is

denied.

### III.    Breach of Fiduciary Duty, Duty of Loyalty and Inducing Breach of Duty

A.    Fiduciary Duty and Duty of Loyalty in Utah

Under Utah law, there are two types of fiduciary relationships.  There are traditionally

recognized fiduciary relationships created by contract, such as principal and agent.  See First

Security Bank of Utah v. Banberry Dev. Corp., 786 P.2d 1326, 1332 (Utah 1990).  Utah courts

recognize a fiduciary relationship between an employer and employee.  See Prince, Yeates &

Geldzahler v. Young, 94 P.3d 179 (Utah 2004); Envirotech Corp. v. Callahan, 872 P.2d 487,

496-97 (Utah Ct. App. 1994).  Then there are fiduciary relationships that are "implied in law due

to the factual situation surrounding the involved transactions and the relationship of the parties to

each other and to the questioned transactions."  See First Security Bank of Utah 786 P.2d at

1332.  The First Security Bank court provided the following guidance for determining whether

an implied-in-law fiduciary relationship existed:

> [T]o determine whether a fiduciary duty should be implied in law due to the
> factual situations surrounding the transaction and the relationship of the parties,
> we consider the following principles:
>
> > A fiduciary relationship imparts a position of peculiar confidence placed
> > by one individual in another.  A fiduciary is a person with a duty to act
> > primarily for the benefit of another.  A fiduciary is in a position to have
> > and exercise and does have and exercise influence over another.  A
> > fiduciary relationship implies a condition of superiority of one of the
> > parties over the other.  Generally, in a fiduciary relationship, the property,
> > interest or authority of the other is placed in the charge of the fiduciary.

Id. at 1333 (footnotes and citations omitted).

The First Security Bank court recognized that "[w]hether or not a fiduciary relationship exists depends on the facts and circumstances of each individual case." First Security Bank of Utah, 786 P.2d at 1332. Here, there is sufficient evidence that Mr. Ivie owed a fiduciary duty or, alternatively, an implied-in-law fiduciary duty, to Farm Bureau. Mr. Ivie testified that Farm Bureau relied on him to recruit, train, and supervise agents that were assigned to him in his area. This same evidence supports the claim that Farm Bureau placed "peculiar confidence" in and was "dependent" upon Mr. Ivie in his role as Agency Manager over the entire southern Utah region. Also, it supports Farm Bureau's claim that Mr. Ivie as an employee owed a duty of loyalty to Farm Bureau.

The evidence indicates that while Mr. Ivie was employed by Farm Bureau he had numerous contacts with American National that raise a reasonable inference that Mr. Ivie breached his fiduciary duty and duty of loyalty to Farm Bureau because he was planning to leave Farm Bureau and to recruit its top producers to join him at American National. For example, approximately five months before Mr. Ivie left Farm Bureau, Mr. Ivie told Mr. Gallacher in an e-mail that he had "9 agents that are willing to follow me day one. With 6 additional in the first year. I have three folks in licensing now. We discussed the idea of hiring them now under you with the plan that I would take them over when I made the switch . . . . I am confident that we could have the 20 agent shop within short order. Experienced agents with a proven track record." (E-mail from Mr. Ivie to Mr. Gallacher (Oct. 25, 2002), attached as Ex. 8 to Pls.' Mem. in Opp'n of Defs.' Mot. for Partial Summ. J. With Respect to Pls.' Claims for Breach of Fiduciary Duty and Duty of Loyalty and Inducing Breach of Duty ("Pls. Opp'n Mem. to Breach of Fiduciary Duty").) In this same e-mail, Mr. Ivie told Mr. Gallacher that: "[i]n one of the

counties we have over 100 farms.  I can put an agent in this county that would not be under the 'No Solicitation' agreement.  Therefore, we could begin working on those immediately."  (Id.)

Mr. Ivie also wrote in a subsequent e-mail to Mr. Gallacher on Oct. 28, 2002, that "we would have 10 agents day one."  (E-mail from Mr. Ivie to Mr. Gallacher (Oct. 28, 2002), attached as Ex. 9 to Pls.' Opp'n Mem. to Breach of Fiduciary Duty.)  And Mr. Ivie provided a list of names to Mr. Gallacher of the agents in his agency—Grant Stubbs, Don Wells, Kevin Whisenant, Robert Wells, Tim Vensel, Dale Ure, Laynce Bartuff, and Brooke Bartuff.  (Id.)  Mr. Ivie also stated, "I am confident that these folks will go with us.  Without my help they will stay with FB."  (Id.)

American National provided testimony from some of the former Farm Bureau agents and agents-in-training that Mr. Ivie did not cause them to leave Farm Bureau.  But the evidence, including the communications above, supports a reasonable inference in favor of Farm Bureau that Mr. Ivie was involved in recruiting Farm Bureau agents to American National while he was employed by Farm Bureau.

Finally, American National argues that Farm Bureau fails to present evidence of any damages for the alleged breach of fiduciary duty and duty of loyalty.  But Farm Bureau has maintained throughout this case that as a direct result of the actions of Mr. Ivie, Mr. Gallacher, and American National Farm in causing the exodus of agents and agents-in-training from Farm Bureau to American National, Farm Bureau lost income-producing agents, the benefit of the money and time expended in recruiting potential agents and getting them through the approval process to the licensing stage.

Because Farm Bureau raises genuine disputes of material facts regarding whether Mr. Ivie breached his fiduciary duty and duty of loyalty to Farm Bureau by recruiting Farm Bureau

agents and thereby causing them to join American National, summary judgment is denied.

B.      Inducing Breach of Fiduciary Duty and Duty of Loyalty in Utah

American National points out that no Utah cases have specifically recognized the cause of action of inducing a breach of fiduciary duty and/or duty of loyalty. According to American National, on that basis alone the court should grant summary judgment. Alternatively, American National argues that even assuming there is such a claim, there is no evidence that any of the agents left Farm Bureau, or that any of Farm Bureau's customers switched their insurance to American National, as a result of any breach by Mr. Ivie of an alleged duty.

Farm Bureau takes the position that the Utah Supreme Court has implicitly recognized the existence of such a claim[3] and that the Restatement (Second) of Torts supports this cause of action. According to the Restatement, aiding and abetting the breach of a fiduciary duty is defined as follows: "[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Holmes v. Young, 885 P.2d 305, 308 (Colo. Ct. App. 1994) (quoting Restatement (Second) of Torts § 876(b)). Farm Bureau also provides numerous citations to other state and federal court opinions that have adopted the cause of action.

The substantial support from other jurisdictions and the Restatement (Second) of Torts are persuasive. It appears that the Utah state courts, if faced with the issue, would recognize such a cause of action. Accordingly, the court will look at the merits of the claim.

---

[3] Farm Bureau supports its position with the case United Park City Mines Co. v. Greater Park City Co., 870 P.2d 880 (Utah 1993). But the United Park City Mines court never addressed the issue of whether Utah recognizes a claim for inducing a breach of fiduciary duty. Rather, the court resolved all claims on statute of limitations grounds.

In addition to the communications between Mr. Ivie and Mr. Gallacher that have previously , there is other evidence that raises a genuine dispute of material fact regarding whether Mr. Gallacher and American National induced Mr. Ivie to breach his fiduciary duty and duty of loyalty.  For example, during the month of January 2003, while Mr. Ivie was still employed with Farm Bureau, Farm Bureau has produced evidence indicating that Mr. Ivie was the contact person between American National and the Farm Bureau agents who were switching to American National.  Specifically, on January 9, 2003, Mr. Gallacher sent an e-mail to Mr. Ivie asking Mr. Ivie who would be attending the American National training at the end of January: "FW: Agenda for NV training.  Need an rsvp from all who will attend."  (E-mail from Mr. Gallacher to Mr. Ivie (Jan. 9, 2003), attached as Ex. 19 to Pls.' Opp'n Mem. to Breach of Fiduciary Duty.)  On January 11, 2003, Mr. Gallacher sent an e-mail to Mr. Ivie inquiring which of his agents would be interested in obtaining a training manual from American National for creating an office.  (E-mail from Mr. Gallacher to Mr. Ivie (Jan. 11, 2003), attached as Ex. 20 to Pls.' Opp'n Mem. to Breach of Fiduciary Duty.)

For the foregoing reasons, summary judgment is denied because there are genuine disputes of material fact regarding whether Mr. Gallacher and American National induced Mr. Ivie to breach his fiduciary duty and duty of loyalty to Farm Bureau.

**IV.    Business Disparagement, Trade Libel, Injurious Falsehood, and Defamation**

In Farm Bureau's Third Amended Complaint, its Seventh Cause of Action is for business disparagement.  Farm Bureau alleges that American National made harmful statements about Farm Bureau to Farm Bureau's employees and insureds that were exaggerations, distortions, and false.

Farm Bureau's Eighth Cause of Action is for trade libel and injurious falsehood.  Farm

Bureau alleges that American National published false statements about the viability of Farm Bureau and about the quality and integrity of its business practices and services that caused Farm Bureau to suffer economic loss.

Farm Bureau's Ninth Cause of Action is for defamation.  Farm Bureau alleges that American National published false statements about the viability of Farm Bureau and about the quality and integrity of its business practices and services that caused Farm Bureau to suffer economic loss.  Farm Bureau further alleges that the statements constitute defamation *per se,* entitling Farm Bureau to recovery of damages without proof of special damages.

American National contends that Farm Bureau has no proof of damages caused by the alleged injurious and defamatory statements.  Further, American National claims that some of the alleged defamatory statements are true and/or non-actionable opinion and that none of the statements can sustain a defamation *per se* claim.

The disparaging and defamatory statements alleged by Farm Bureau come from three sources: statements made at a February 2003 meeting held by American National in Fillmore, Utah; e-mails sent by American National executive vice-president Greg Ostergren regarding certain Standard & Poor's reports about Farm Bureau; and statements allegedly made by an American National agent about Farm Bureau's financial status.

The substance of these alleged disparaging statements can be divided into six categories: (1) statements about Farm Bureau's financial well-being (allegedly made at the Fillmore meeting by an American National representative and statements made by Mr. Tim Vensel, a former Farm Bureau agent); (2) statements that Farm Bureau was a so-called "good ole boy" company that gave preferential treatment to claims of some individuals over others (allegedly made at the Fillmore meeting); (3) e-mails regarding Farm Bureau's Standard & Poor's rating (originally sent

17

by Mr. Ostergren); (4) statements that Farm Bureau did not service its clients well (allegedly made at the Fillmore meeting); (5) statements that Farm Bureau was discouraging the sale of new policies (allegedly made at the Fillmore meeting); and (6) statements that Farm Bureau was unfair to its agents and employees (allegedly made at the Fillmore meeting).

Although Farm Bureau has stated its claims for business disparagement and trade libel/injurious falsehood separately, case law establishes that they are merely different names for a single tort.  See Bankwest v. Fidelity & Deposit Co., 63 F.3d 974, 980 (10th Cir.1995) (stating that the tort now generally referred to as "injurious falsehood" has been called by such names as "disparagement of property," "slander of goods," "commercial disparagement," and "trade libel"); see also W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 128, at 963-64 (5th ed. 1984).  Accordingly, the court will address these two separate claims under the injurious falsehood cause of action.

In order for a plaintiff to recover under a claim of injurious falsehood, it must prove (a) falsity of the statement made, (b) malice by the party making the statement, and (c) special damages.  Direct Import Buyers Ass 'n v. KSL, Inc., 538 P.2d 1040, 1042 (Utah 1975).  To sustain a claim for injurious falsehood, the plaintiff must demonstrate an economic interest that has been harmed by the allegedly false statement.  See Watkins v. General Refractories Co., 805 F. Supp. 911, 917 (D. Utah 1992); see also Restatement (Second) of Torts § 623A cmt. f (stating that damages in actions for injurious falsehood are limited to harm to interests of the plaintiff having pecuniary value, and to actual, proved pecuniary loss).

To state a claim for defamation, a plaintiff must show that the defendant published statements concerning the plaintiff; that the statements were false, defamatory, and not subject to any privilege; that the statements were published with the requisite degree of fault; and that their

publication resulted in damage.  See West v. Thompson Newspapers, 872 P.2d 999, 1007-08

(Utah 1994).  There are two types of defamation—libel and slander.  Libel is defined as:

> [A] malicious defamation, expressed either by printing or by signs or pictures or
> the like, tending to blacken the memory of one who is dead, or to impeach
> honesty, integrity, virtue or reputation, or publish the natural defects of one who is
> alive, and thereby to expose him to public hatred.

Utah Code Ann. § 45-2-2(1) (2005).  Slander is defined as "any libel communicated by spoken

words."  Id. § 45-2-2(2).

Some of the evidence on which Farm Bureau relies is inadmissible.  But the court need

not discuss the content of the statements because Farm Bureau has failed to produce evidence of

damages resulting from these alleged statements.

There is no admissible evidence that Farm Bureau customers terminated their policies,

failed to renew policies, or reduced their business with Farm Bureau because of the alleged

disparaging and defamatory statements at the Fillmore meeting.  Further, Farm Bureau's Rule

30(b)(6) deponent, Gary Harms, testified that he has no information of any customers

terminating their policies due to statements made about Farm Bureau at the Fillmore meeting.

Accordingly, Farm Bureau's failure to allege any admissible evidence of damages is fatal to its

claims.

A.      Libel or Slander *Per Se*

Because Farm Bureau failed to allege any admissible evidence of damages, its only viable

avenue for defamation is based on defamation *per se*.  If a statement is defamatory *per se*,

damages are presumed.  See Computerized Thermal Imaging, Inc. v. Blooberg, L.P., 312 F.3d

1292, 1297 (Utah 2002); Allred v. Cook, 590 P.2d 318, 321 (Utah 1979).

The test to determine whether a statement is libelous *per se* is when language is used

concerning a person or that person's affairs that from its nature must, or presumably will as its

19

natural and proximate consequence, cause pecuniary loss to the person about whom the statement

is made.  See Computerized Thermal Imaging, 312 F.3d at 1297 (citing Nichols v. Daily

Reporter Co., 83 P. 573, 574 (Utah 1905)).

Farm Bureau's only allegations of relevant and admissible evidence regarding libel *per se*

are based on Mr. Ostergren's e-mails.[4]  But Mr. Ostergren's e-mails, which had Standard &

Poor's Reports attached to them, are not libelous *per se*.  Rather, these e-mails simply

accompanied accurate credit reports, and contained benign statements to Mr. Ostergren's

colleagues at American National about industry difficulties and statements rallying his team for

potential opportunities ahead.  There is nothing in these e-mails that would cause pecuniary loss

to Farm Bureau.

If a statement is slanderous *per se,* damages and malice are implied and the defamation

---

[4] In an e-mail dated January 21, 2003, Mr. Ostergren prefaces an attached Standard & Poor's report with the following:

> This is interesting information on the Farm Bureau in Iowa.  Please note that we have also experienced severe storms in the same states but we performed much better.  As I have noted before, a growing number of companies in our industry are experiencing difficulties.  This presents increasing opportunities for us.  With opportunity always comes challenge.  I believe we are up to that challenge!

(See Ex. A to Second Set of Interrogs., attached as Ex. 14 to Defs.' Mem. in Supp. for Partial Summ. J. With Respect to Pls.' Claims for Business Disparagement, Trade Libel and Injurious Falsehood, and Defamation ("Defs.' Mem. in Supp. of Business Disparagement").)

In a later e-mail, again prefacing an attached Standard & Poor's report, Mr. Ostergren wrote:

> A major competitor of ours in Kentucky.  Our industry has hit a "Perfect Storm".  Along with a Perfect Storm, comes a Perfect Opportunity, and of course along with a Perfect Opportunity comes a Perfect Challenge.  We as a Company are up to the Challenge. Execution of our Triline and MDRT Strategic Initiatives and developing clients versus selling price, will be the drivers in meeting the Perfect Challenge.  Your role is Critical.  Let's make 2003 the Best Year Ever!

(Id.)

claim can go forward without proof of those elements.  See Allred, 590 P.2d at 321.  To
constitute slander *per se,* a statement must fall into one of four categories: (1) charge of criminal
conduct; (2) charge of a loathsome disease; (3) charge of conduct that is incompatible with the
exercise of a lawful business, trade, profession, or office; and (4) charge of unchastity of a
woman.  Id. at 320 (emphasis added).  Additionally, the statement in question must not be
susceptible to any meaning other than one falling plainly and unambiguously within the four
categories above.  See Johnson v. Community Nursing Services, 985 F. Supp. 1321, 1328 (D.
Utah 1997).  If the statement is capable of two interpretations, one slanderous and the other not,
the statement cannot be slander *per se.*  See id.

Farm Bureau maintains that the statements made by the American National representative
at the Fillmore meeting charged Farm Bureau with conduct incompatible with the exercise of a
lawful business.  Farm Bureau's only source of evidence regarding the allegedly defamatory
statements made at the Fillmore meeting is Mr. Swallow's testimony.  Mr. Swallow testified that
the American National representative told the attendees "how bad Farm Bureau was, how they
didn't pay their claims, and that they only played [sic] it to a  special privileged few.  (Swallow
Dep. at 51, attached as Ex. 2 to Defs.' Mem. in Supp. of Business Disparagement.)  Further, Mr.
Swallow initially testified that the representative stated that Farm Bureau was "going out of
business–or that they were in serious financial trouble, about to go out of business, or something
to that effect."  (Id. at 52.)  But later in Mr. Swallow's deposition, he stated that he did not know
whether the representative actually said that Farm Bureau was going out of business, but rather,
that was the "feeling [Mr. Swallow] came away with."  (Id. at 55-56.)

Even given these statements' most negative implications, the court finds that these
statements attributed to American National do not comment upon the lawfulness of Farm

Bureau's business or its conduct.  Because the statements are susceptible to a variety of meanings, none of the statements constitute the narrowly defined slander *per se.*

For the reasons stated above, American National's motion for summary judgment is granted regarding Farm Bureau's claims of business disparagement, trade libel, injurious falsehood, and defamation.

**V.    Ivie's Counterclaims**

Because Farm Bureau informed the court that Farm Bureau and Mr. Ivie are in settlement negotiations,  Farm Bureau's motion is DENIED without prejudice.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.    Defendants' Motion for Partial Summary Judgment With Respect to the Interpretation of the Non-solicitation Provision (Dkt # 219) is DENIED WITHOUT PREJUDICE.

2.    Defendants' Motion for Partial Summary Judgment With Respect to the Plaintiffs' Claims for Misappropriation of Trade Secrets (Dkt # 230) is DENIED.

3.    Defendants' Motion for Partial Summary Judgment With Respect to the Plaintiffs' Claims for Breach of Fiduciary Duty and Duty of Loyalty and Inducing Breach of Duty (Dkt # 232) is DENIED.

4.    Defendants' Motion for Partial Summary Judgment With Respect to the Plaintiffs' Claims for Business Disparagement, Trade Libel and Injurious Falsehood, and Defamation (Dkt # 234) is GRANTED.

5.    Plaintiffs' Motion for Summary Judgment With Respect to Ivie's Counterclaims (Dkt # 239) is DENIED WITHOUT PREJUDICE.

DATED this 3rd day of May, 2007.

BY THE COURT:

TENA CAMPBELL
Chief Judge