IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| FARM BUREAU LIFE INSURANCE COMPANY and FARM BUREAU MUTUAL INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>AMERICAN NATIONAL INSURANCE COMPANY, AMERICAN NATIONAL GENERAL INSURANCE COMPANY, AMERICAN NATIONAL PROPERTY & CASUALTY COMPANY, DARRIN IVIE and KENNETH GALLACHER,<br><br>Defendants. | **ORDER**<br><br>**AND MEMORANDUM DECISION**<br><br><br>Case No. 2:03 CV 646 (TC) |

In this diversity action the Plaintiffs Farm Bureau Life Insurance Company and Farm Bureau Mutual Insurance Company (collectively "Farm Bureau") claimed that the Defendants American National Insurance Company, American National General Insurance Company, American National Property & Casualty Company (collectively "American General"), Kenneth Gallacher and Darrin Ivie had conspired to entice Farm Bureau agents and agent recruits to leave Farm Bureau and join American National. At the time of trial, six causes of actions remained against the Defendants: breach of duty of loyalty as an employee against Mr. Ivie; inducing the breach of loyalty against all Defendants except Mr. Ivie; breach of fiduciary duty against Mr. Ivie; inducing the breach of fiduciary duty against all Defendants except Mr. Ivie; tortious

interference with prospective economic relations against all Defendants;  civil conspiracy against all Defendants.  Following a nine-day trial, a jury returned verdicts in favor of Farm Bureau against all Defendants on all causes of action.  The jury awarded Farm Bureau $3,606,214 in compensatory damages and $62,727,000 in punitive damages.

Defendants have filed motions challenging the jury's verdicts. They seek alternative remedies:  judgment as a matter of law in their favor, a new trial or remittitur.  For the reasons explained below, the court denies the motions for judgment as a matter of law and the motions for a new trial but does grant the motions for remittitur.

## DISCUSSION[1]

### I.      Defendants' Motions for Judgment as a Matter of Law and Motions for a New Trial

"Judgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion."  Mason v. Okla. Tpk. Auth., 115 F.3d 1442, 1450 (10th Cir. 1997).  A court must view the evidence and all inferences drawn from the evidence in the light most favorable to the nonmoving party. Wolfgang v. Mid-America Motorsports, Inc., 111 F.3d 1515, 1522 (10th Cir. 1997).  A court will not weigh the evidence or the credibility of the witnesses and will not substitute its judgment for that of the jury.  Brown v. McGraw-Edison, Co., 736 F.2d 609, 613 (10th Cir. 1984).  Moreover, a court will grant a motion for a new trial only if the verdict is "'clearly, decidedly, or overwhelmingly against the weight of the evidence.'"  Champion Home Builders v. Shumate, 388 F.2d 806, 808 (10th Cir. 1967) (quoting Locke v. Atchison, Topeka & Santa Fe Ry. Co., 309

---

[1]Because the parties describe much of the factual background of this case in their pleadings, the court will relate facts only when necessary to explain its order.

F.2d 811, 816 (10th Cir. 1962)).  Defendants raise a number of arguments in support of their

contentions.  The court now considers each of Defendants' arguments.

       a.     <u>Alleged Juror Misconduct</u>

      Defendants argue that they are entitled to a new trial because Juror Number 8  failed to

disclose during voir dire that his deceased grandfather had worked for an organization of farmers

in Ohio called Farm Bureau.  According to Defendants, this deprived them of an impartial jury in

violation of their due process rights.

      During voir dire, the court asked the potential jurors whether they had "any connections

with" the insurance companies involved, which the court told potential jurors it would

collectively refer to as Farm Bureau and American National.  (Mem. Supp. ANPAC ANGIC

Mot. J. Matter Law or New Trial or Remittitur, Ex. D; Trial Tr., 55,  July 28, 2008, Docket No.

504.)  None of the jury panel, including Juror Number 8, answered in the affirmative and  the

court continued with questioning.  Later, the court stressed to the potential jurors that, if selected

to serve on the jury, they would "be dealing with insurance companies and insurance agencies

and insurance agents." (<u>Id.</u> at 61.)  The court asked the potential jurors whether any of them felt

that they "could not be impartial in such a case."  (<u>Id.</u> at 61-62.)  Juror Number 8 remained silent.

(<u>Id.</u>)  Finally, the court asked whether any of the potential jurors had "family, close family or

close friends, who have worked for insurance companies."  (<u>Id.</u> at 62.)  Again, Juror Number 8

said nothing.  (<u>Id.</u>)

      Immediately after trial, counsel for American National starting contacting members of the

jury, including Juror Number 8.  During his conversation with an attorney for American

National, Juror Number 8 revealed the information about his grandfather and told the attorney

that Cy Winters, Farm Bureau's corporate representative, reminded Juror 8 to some extent of his grandfather.

Defendants now maintain that Juror Number 8  failed to honestly answer questions during voir dire and had he disclosed the information about his grandfather, Defendants would have had a valid basis to challenge for cause.  Farm Bureau disputes Defendants' conclusions and submitted an affidavit from Juror Number 8.  (Pls.' Mem. Opp'n Defs.' Mot. New Trial or J. Matter Law, Ex. 1, Aff. Juror 8, Docket No. 603.)  In his affidavit, Juror Number 8 explained that although he knew that his deceased grandfather had worked for an organization in Ohio called Farm Bureau, Juror Number 8 remained silent during voir dire because he did not believe that his grandfather had worked for the same company that was a party in the trial and he did not believe that his grandfather worked in insurance.  Juror Number 8's grandfather had died twenty-seven years earlier and Juror Number 8 "did not have a close relationship with him." (Id. 7.)  Juror Number 8 had never discussed his grandfather's work with him and did not know what his grandfather thought about his employer. After trial, Juror Number 8 learned that his suspicions were correct and that his grandfather had worked in oil distribution.  Juror Number 8 stated that his grandfather's employment with a company called Farm Bureau did not influence in any way his ability to be fair and impartial.

The court is convinced that Juror Number 8 honestly responded to the voir dire questions when he remained silent, even if perhaps, in hindsight, it might have been more prudent had he disclosed the information about his grandfather.  His grandfather did not, in fact, work in or have a connection with the insurance business.  And Juror Number 8's understanding of his grandfather's work is entirely consistent with the complicated structure of the Farm Bureau

entities. American Farm Bureau Federation is a national organization, which includes many individual state organizations that do not necessarily have any connection to each other.  These state organizations provide services directly to farmers, and only some of them are in the insurance business.  Notably, Ohio's state organization is one of the state organizations that is not in insurance. Because Juror Number 8 believed that his grandfather was involved in oil distribution, not insurance, it is understandable why he concluded that he could remain silent.[2]

To preserve the sanctity of verdicts, Rule 606(b) of the Federal Rules of Evidence bars any inquiry into the deliberative process of a jury or a juror's own mental process.  The rule reads in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as . . . to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

Fed. R. Evid. 606(b).  The rule "applies not just to juror testimony offered at a conventional evidentiary hearing but also extends to any other proceeding, on or off the record, in which the validity of a verdict becomes an issue."  27 Charles Alan Wright & Victor James Gold, Federal Practice and Procedure: Evidence 2d § 6074, 479-80 (2007).

The court views Defendants' arguments as an impermissible challenge to the validity of the verdict.  The Tenth Circuit's recent decision in United States v. Benally, 546 F.3d 1230 (10th

---

[2]American National also contends that Juror Number 8 is biased because Mr. Winters, who testified on behalf of Farm Bureau at trial, bore a resemblance to the grandfather of Juror Number 8.  This argument has no conceivable legitimate connection to Juror Number 8's silent responses during voir dire.  Consequently, this argument cannot be viewed as anything but a challenge to the validity of the verdict.  Rule 606(b) bars consideration of such evidence, and as discussed in detail later, the evidence of alleged bias is not admissible.

Cir. 2008), is instructive.[3]   Kerry Benally, a Native American, was charged with having forcibly

assaulted a federal officer.  During voir dire, the trial court asked the jury panel whether the fact

that Mr. Benally was a Native American could influence any panel member's consideration of

the case and whether any of them had had a negative experience with Native Americans.  No

juror answered in the affirmative to any of the questions.  Mr. Bennally was convicted of the

charge and, immediately after trial, one of the jurors, K.C., told defense counsel that during the

jury deliberations, the jury foreperson had told the other members of the jury that he used to live

by an Indian reservation and that when Native Americans were drunk, they were violent.

Another member of the jury agreed with the foreperson.  K.C. also told defense counsel of

another discussion in the jury room when jurors talked about "a need to send a message back to

the reservation."  Id. at 1232.  During this conversation, another juror said he had family

members in law enforcement and had "heard stories from them about what happens when people

mess with police officers and get away with it."  Id.

        The juror, K.C., signed an affidavit describing these events, and Mr. Benally filed it in

support of a motion to vacate the verdict and receive a new trial.  Mr. Bennally took the position

that the jurors had not been honest during voir dire (the same argument Defendants raise here)

and had improperly considered information that was not in evidence.  The trial court agreed with

Mr. Bennally and granted a new trial.

        On appeal, the Tenth Circuit, after a thorough examination of Rule 606(b), concluded that

---

        [3]Even though this is a diversity action, federal law controls the court's analysis. See
Wilson v. Vermont Castings, 977 F. Supp. 691 (M.D. Pa. 1997), aff'd 170 F.3d 391 (3d Cir.
1999) (applying federal law in analysis of Rule 606(b) issue in diversity action).

the juror K.C.'s affidavit was inadmissible.  The court pointed out that the Rule bars a juror from

testifying about matters that occur during jury deliberations and, therefore, K.C.'s affidavit was

also inadmissible.  The court rejected Mr. Bennally's argument that the affidavit testimony was

not covered by the Rule because, according to Mr. Bennally, the testimony was offered to show

that a juror had failed to answer honestly during voir dire and was not being offered in

connection with an "inquiry into the validity of a verdict or indictment."  Fed. R. Evid. 606(b).

The court stated: "We cannot accept this argument.  Although the immediate purpose of

introducing the testimony may have been to show that the two jurors failed to answer honestly

during voir dire, the sole point of this showing was to support a motion to vacate the verdict and

for a new trial.  That is a challenge to the validity of the verdict." Benally, 546 F.3d at 1235.

     In cases such as this where a party challenges the jury's verdict on the basis of a juror's

alleged untruthfulness, the U.S. Supreme Court has fashioned a two-part test.  First, the party

must show that the juror failed to honestly answer a material question on voir dire and second,

show that a correct answer would have provided a valid basis for a challenge for cause.

McDonough Power Equip., Inc., v. Greenwood, 464 U.S. 845, 849 (1989).  A party cannot

satisfy the first part of the test if a juror gives a "mistaken though honest response to a

question . . . ." Id. at 849-50.  The Court noted that to hold otherwise "is to insist on something

closer to perfection that our judicial system can be expected to give."  Here, Juror Number 8's

answers were honest (and might even have been correct).

     Accordingly, the court finds that Defendants' motions based on their claims of juror

misconduct are without merit.[4]

b.      Causation

Defendants contend that the evidence was not sufficient to establish that they caused the agents and agent recruits to leave Farm Bureau and join American National.  The court disagrees.

In its opposition memorandum, Farm Bureau described in some detail the evidence which showed that Mr. Ivie and Mr. Gallacher, acting as American National's agents, began in 2001 to take steps to cause the agents to leave Farm Bureau. (See Pls.' Mem. Opp'n  Defs.'Mot. New Trial or J. Matter Law, 11-19, Docket No. 603.)  This evidence included a number of emails that clearly outlined Mr. Ivie's and Mr. Gallacher's intentions and actions.  (Id.)  In short, there was more than sufficient evidence to justify the jury's conclusion that Mr. Gallacher, Mr. Ivie and American National caused the agents and agent recruits to leave Farm Bureau.

c.      Independent Contractor

Defendants argue that the court erred when it refused to instruct the jury about the difference between an independent contractor and an agent.  Defendants argue that because the court's failure was allegedly prejudicial, they are owed a new trial.  For the same reasons that the court refused to give the requested instruction, the court now denies their motions based on this contention.

The controlling issue was whether Mr. Gallacher had been acting as an agent when he recruited the Farm Bureau agents.  The court gave the jury four instructions on agency, which

_____

[4]Because the affidavit of Juror Number 8 adequately describes the reasons for his silence during voir dire and because the court is completely persuaded that it would reach the same conclusion even if Juror Number 8 testified at an evidentiary hearing, the court denies Defendants' request for such a hearing.

outlined what the jury should consider when deciding whether Mr. Gallacher was American National's agent.  (Jury Instructions Nos. 15-18, Docket No. 499.)  The court concluded that an additional instruction regarding the difference between an independent contractor and an agent would be confusing and not relevant.

Moreover, the evidence was clear that Mr. Gallacher was, in fact, acting as American National's agent when he recruited the Farm Bureau agents.  For example, Gregory Ostergren testified about Mr. Gallacher's role in recruiting agents for American National.[5]  (Trial Tr. vol. 9, 5-45, Aug. 6, 2008, Docket No. 566.)  During the relevant time period, Mr. Gallacher was a regional director for all three of the Defendant insurance companies.  (Id. 23.)  Mr. Ostergren indicated that the only way that American National recruited agents was through its regional directors, like Mr. Gallacher.  (Id. 22.)  When regional directors recruit agents, he explained, "they are standing in place of American National . . . ."  (Id.)  Furthermore, Mr. Ostergren admitted that when Mr. Gallacher was recruiting Mr. Ivie and the Farm Bureau agents he was acting on behalf of American National.  (Id.)

    d.    <u>Fiduciary Duty</u>

As Defendants did in their motions for partial summary judgment before trial, they argue that they are entitled to judgment as a matter of law on the fiduciary duty claims.  Defendants argue that the court gave an erroneous instruction concerning Farm Bureau's argument that Mr.

---

[5] Mr. Ostergren described his positions with American National:  "I head up the Multiple Line Division at American National.  My titles include Executive Vice President of American National Insurance Company, Chairman and President and CEO of American National Property and Casualty Insurance Company and Chairman of Farm Family Insurance Companies."  (Trial Tr. vol. 9, 5, Aug. 6, 2008, Docket No. 566.)  He later testified that he was also "Chairman, President and CEO" of American National General Insurance Company. (Id. 20.)

Ivie had breached a fiduciary duty owed to Farm Bureau. (Mem. Supp. Defs.' Mot. J. Matter Law

or Mot. New Trial, 29-31, Docket No. 585.)  Moreover, Defendants contend that because there

was no evidence that Mr. Ivie used confidential information to compete against Farm Bureau

after he resigned, Mr. Ivie should not be liable for a breach of fiduciary duty.

     In the order denying Defendants partial summary judgment, the court gave a detailed

discussion of its reasons supporting the conclusion that Utah courts would, if faced with the

fiduciary duty issue, recognize a cause of action against Mr. Ivie.  (Order & Mem. Decision Den.

Mot. Partial Summ. J. 12-16, Docket No. 306.)  For essentially the same reasons, the court now

holds that the jury instruction it gave on fiduciary duty was correct and that the evidence was

sufficient to find that Mr. Ivie breached that duty.  (See Jury Instruction No. 21, Docket No. 499.)

     Finally, the court is not persuaded by Defendants' argument that their case was prejudiced

by the court's failure to instruct the jury that mere preparations to compete do not violate the duty

of loyalty.  In its instruction on the duty of loyalty, the court told the jury that Farm Bureau had to

prove "[t]hat the breach [of the duty of loyalty] directly caused damages to the Plaintiff."  (Jury

Instruction No. 19, Docket No. 499.)  The instruction made clear that a Defendant could be liable

only if the actions were carried out and it resulted in harm to Farm Bureau.

    e.   <u>Inducement</u>

     The jury found Defendants liable on Farm Bureau's claims that the Defendants had

induced Mr. Ivie to breach both his duty of loyalty and his fiduciary duty.  For a particular

Defendant to be liable for inducing Mr. Ivie to breach his duty of loyalty, the court instructed the

jury that it had to find that Mr. Ivie had breached his duty of loyalty and that the particular

Defendant had "intentionally induced Mr. Ivie to breach or violate his duty." (Jury Instruction

No. 20, Docket No. 499.)  The court gave a similar instruction on the elements necessary for the jury to find that Defendants had induced Mr. Ivie to breach his fiduciary duty. (Jury Instruction No. 22, Docket 499.)  For both instructions, the court told the jury that the phrase "intentionally induced" meant that the particular Defendant knew Mr. Ivie owed Farm Bureau the duty, knew that Mr. Ivie was acting in violation of the duty, "and that the Defendant intentionally gave substantial assistance or substantial encouragement to Mr. Ivie to act as he did."  (Jury Instructions Nos. 20 & 22, Docket No. 499.)

Defendants raise three arguments in connection with the claims of inducement.  First, they contend that because Utah courts have not recognized the tort of inducing a breach of fiduciary duty or a breach of the duty of loyalty, the court erred in allowing the jury to consider these claims.  Defendants raised the same argument in their motions for partial summary judgment, and the court rejected it.  (Order & Mem. Decision Den. Mot. Partial Summ. J. 15-16, Docket No. 306.)  For essentially the same reasons, the court again concludes that Defendants' argument is not persuasive.

Second, the Defendants maintain that the court erred in including the language "substantial assistance or substantial encouragement" in Jury Instructions 20 and 22.  Defendants object to the inclusion of both phrases.  They contend that, rather than permit a jury to find inducement liability when there is only encouragement, the "better-reasoned approach is to allow inducement liability only when there is participation."  (Defs.' Mem. Supp. Mot. J. Matter of Law or Mot. New Trial, 28, Docket No. 585.)  Although Defendants acknowledge that the court's instruction followed the Restatement (Second) of Torts, they maintain that the instruction was improper without evidence of intent to do harm or, at least, negligence. (Id. at 26.)

11

The challenged instructions provide that in order for the jury to find a particular Defendant liable for having induced Mr. Ivie to breach a duty owed to Farm Bureau, the evidence must show that "the particular Defendant intentionally induced Mr. Ivie to breach or violate his duty." (Jury Instructions Nos. 20 & 22, Docket No. 498.)  Moreover, as discussed in this order in the context of Defendants' challenge to the sufficiency of evidence that they caused the agents to leave, the court concludes that sufficient evidence exists that Mr. Gallacher, while acting as American National's agent, participated in the plan to lure the agents away from Farm Bureau. Farm Bureau recounted much of this evidence in its memorandum.  (See Pls.' Mem. Opp'n Defs.' Mot. New Trial or J. Matter Law, 11-19, Docket 603.)

Finally, Defendants argue that Farm Bureau's attorney admitted in his opening statement that American National did nothing illegal by recruiting Mr. Ivie.  Consequently, according to Defendants, the court should grant judgment as a matter of law because of Farm Bureau's "judicial admission."  (Defs.' Mem. Supp. Mot. J. Matter Law or Mot. New Trial, 34-35, Docket No. 585.)  But Defendants' characterization of counsel's statements is incorrect.  As Farm Bureau  points out, its attorney was, in fact, comparing what Defendants could do legally to what Defendants actually did, which Farm Bureau contended was illegal.

    f.    Compensatory Damages

The jury awarded Farm Bureau $3,606,214 in compensatory damages.  This amount is consistent with the opinion of Farm Bureau's damage expert, Rick Hoffman, who testified that, in his opinion, Farm Bureau had suffered damages of $3,793,876.

Defendants advance several arguments in support of their contention that the damage award cannot stand.  First, they contend that Mr. Hoffman based his lost profit calculations for

the three agent recruits on speculative evidence.  Second, they argue that Mr. Hoffman's

calculations failed to take into account that Farm Bureau had, within six years, replaced all six of

the agents who left Farm Bureau to join American National.  Third, Defendants maintain that

Farm Bureau was not entitled to damages because one of the six agents, Don Wells, was fired by

Farm Bureau before he joined American National.  Defendants' final argument is that because

one of the agents (Layne Bartruff) ended his contract with Farm Bureau because he was ill, Farm

Bureau should not receive damages for his departure.

The court first notes that the jury did not award Farm Bureau the entire amount Mr.

Hoffman had testified represented the damages suffered by Farm Bureau.  As a consequence,

Defendants do not appear to acknowledge that the jury might well have taken into account the

various arguments Defendants now raise when making its award.  In any event, as discussed

below, the court is satisfied that the record supports the jury's compensatory damage award.

Although American National is correct that the three agent recruits had not yet signed

contracts with Farm Bureau, Farm Bureau presented sufficient evidence that the three recruits

would have become Farm Bureau agents but for the actions of the Defendants.  (Pls.' Mem.

Opp'n  Defs.' Mot. New Trial or J. Matter Law, 33-36, Docket No. 603.)  And regarding

Defendants' argument that Farm Bureau had replaced the six lost agents within two years and

therefore was not entitled to damages beyond that time, the jury heard evidence that because

Farm Bureau wanted to expand its operations in the St. George area, the new agent hires did not

replace those who had left.  As Cyrus Winters, a vice-president of Farm Bureau, explained, "We

would love to have those six agents and three prospective agent candidates back.  And, so, to the

extent that we were replacing them, we were recruiting for new agents at that time.  And I would

13

say that in a perfect world we would still have those people plus the people we have recruited since then."  (Trial Tr. vol. 5, 15, Aug. 1, 2008, Docket No. 522.)

Mr. Hoffman described why he did not adjust his calculations to reflect Farm Bureau's replacement of the agents: "And if you think of—the way I think of it is you are aiming for ten agents and you have five but are trying to get to ten, want to have ten in your office and somebody takes two, let's say, and then you hire three more, you haven't replaced those two." (Id. 89.)  In sum, a reasonable juror could conclude that Farm Bureau continued to suffer a loss despite having hired a number of agents after the six agents and three agent recruits left.

Defendants further argue that because Farm Bureau fired one of the agents, Don Wells, shortly before the other agents left, Farm Bureau should not receive any damages attributable to Mr. Wells' departure.  However, as Farm Bureau points out, Mr. Wells was fired because of his contacts with American National.  (Pls.' Mem. Opp'n Defs.' Mot. New Trial or J. Matter Law, 33-35, Docket No. 603.)  The jury heard evidence of Mr. Wells' preparations to join American National before he left Farm Bureau.  (Id.)  Moreover, despite the fact that Mr. Wells was not, at the time he left Farm Bureau, particularly successful as an agent, Mr. Winters, a Farm Bureau vice-president, testified that Farm Bureau believed that Mr. Wells' performance could be improved and that Farm Bureau "would have liked to retain him."  (Trial Tr. vol. 5, 75, Aug. 1, 2008, Docket No. 522.)  This evidence was sufficient to support a conclusion that Defendants caused Farm Bureau to suffer a loss when Mr. Wells left.

Finally, Farm Bureau pointed to evidence from which the jury also could have concluded that both Layne Bartruff and his wife Brooke Bartruff  left Farm Bureau to join American National. (Pls.' Mem. Opp'n Defs.' Mot. New Trial or J. Matter Law, 35-36, Docket No. 603.)

14

Consequently, Defendants' arguments to the contrary are without merit.

      g.    <u>Punitive Damages</u>

Defendants essentially argue that the evidence presented to the jury did not justify an award of punitive damages.  (Defendants also maintain that the amount of punitive damages exceeded the limits set by both Federal and Utah law.  The court will discuss this argument in the part of the order dealing with remittitur.)

After the return of the jury's verdict in favor of Farm Bureau against all Defendants, the jury heard the testimony of Mr. Ivie, Mr. Gallacher and Mr. Hoffman, the damages expert.  In closing arguments, the attorney for Farm Bureau told the jury that his client was seeking a total of $30,000,000 in punitive damages.  The jury then retired to deliberate.  After deliberating, the jury found Mr. Ivie liable for $322,000; Mr. Gallacher for $2,400,000; American National Insurance Company for $37,000,000; American National Property and Casualty Company for $15,000,000; and American National General Insurance Company for $7,500,000.  Although, as discussed below, the court concludes that these amounts are excessive, the evidence was more than sufficient to justify an award of punitive damages against each of the Defendants.

Because Farm Bureau gave a fairly extensive description in its opposition memorandum of the evidence concerning Defendants' actions, the court will not go into detail concerning the evidence upon which the jury could base its decision to award punitive damages.  (<u>See</u> Pls.' Mem. Opp'n Defs.' Mot. New Trial or J. Matter Law, 10-20, 41-45, Docket No. 603.)  But the court notes that throughout the trial, the jury saw numerous documents made at the time of the events which supported Farm Bureau's contention that Mr. Gallacher and Mr. Ivie had worked together to lure Farm Bureau's agents and potential agents away from Farm Bureau to work for

American National.  These documents frequently contradicted the testimony of Mr. Ivie and Mr.

Gallacher, which certainly could have lead the jury to believe that Mr. Ivie and Mr. Gallacher

were not telling the truth on the stand.  The jury might also have been offended by the attempts of

Mr. Ivie and Mr. Gallacher to explain the stark differences between their testimony and the

documents.  For example, Mr. Gallacher claimed that statements he made in written documents

were just expressions of his philosophy that if he acted as if events were definitely going to

occur, such as the Farm Bureau agents leaving Farm Bureau and joining American National, the

events would occur.  Finally, because Mr. Gallacher was acting as an agent of American General,

the evidence supported an award of punitive damages against American General.

American National Property & Casualty Company and American National General

Insurance Company also argue that because no evidence was presented of their specific financial

worth, an award of punitive damages against them cannot stand.  But this argument is contrary to

Utah Supreme Court's holding in Hall v. Wal-Mart Stores, 959 P.2d 109 (Utah 1998), in which

the court explained that "a directed verdict or j.n.o.v. should not be granted solely on the basis

that the plaintiff has not introduced evidence of the defendant's relative wealth." Id. at 113.  The

court in Hall also noted that "evidence of relative wealth is still quite important where the

excessiveness of a punitive damages award is at issue." Id.

## II.     Defendants' Motions for Remittitur

The jury awarded a total of $62,722,000 in punitive damages.  When this amount is

compared to the $3,606,214 of compensatory damages awarded, the ratio is approximately

17 to 1.  Defendants contend that this ratio demonstrates the punitive damage award is excessive

under both Utah and federal law.[6]  Farm Bureau responds that this calculation is not the correct

way to compare punitive damages to the compensatory damages and when the correct method is

used, that is, comparing the compensatory damage award to each Defendant's individual punitive

damage award, the ratios are within the acceptable boundaries of both federal and state law.

To guide courts in evaluating whether a punitive damage award is excessive, the Utah

Supreme Court put forward seven factors to consider: the relative wealth of the defendant; the

nature of the alleged misconduct; the facts and circumstances surrounding such conduct; the

effect of the conduct on the lives of plaintiffs and others; the probability of future recurrences of

the misconduct; the relationship of the parties; and the amount of actual damages awarded.

Crookston v. Fire Ins. Exch., 817 P.2d 789, 808 (Utah 1991).

Under federal law, a court looks at three factors in considering the appropriateness of a

punitive damage award: (1) the degree of reprehensibility of the defendant's misconduct; (2) the

disparity between the actual or potential harm suffered by the plaintiff and the punitive damages

award; and (3) the difference between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases.[7]  BMW of N. Amer., Inc. v. Gore, 517 U.S.

559, 575 (1996).  According to the Utah Supreme Court, the guideposts in Utah law

"substantially reflect the [United States] Supreme Court's directives . . . ."  Campbell v. State

Farm Mut. Auto Ins., 98 P.3d 409, 414 (Utah 2004) (citing Smith v. Fairfax Realty, 82 P.3d

1064, 1072 (Utah 2003)).  After consideration of these factors, the court agrees with Defendants

---

[6]One telling indication that the punitive damages award was unreasonable is that even
though Farm Bureau's attorney told the jury in closing argument that an appropriate award would
be around $30,000,000, the jury gave double that amount.

[7]The parties agree that this final factor does not apply in this case.

that the punitive damages award is excessive.

        a.      <u>Reprehensibility of Conduct</u>

The U.S. Supreme Court noted that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." <u>Gore</u>, 517 U.S. at 575. The Court set forth five guideposts for measuring the reprehensibility of a defendant's conduct: (1) whether the harm was physical or economic; (2) whether the conduct showed an indifference or reckless disregard towards the health or safety of others; (3) whether the victim was financially vulnerable; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm resulted from intentional malice, trickery, deceit or simply accident. <u>Id.</u> at 576-77. Examination of these guideposts leads to the conclusion that Defendants' conduct was not remarkably reprehensible.

First, there is no question that the harm Farm Bureau suffered was economic, not physical. Second, although Defendants acted with indifference and reckless disregard for the contractual and property rights of Farm Bureau, no one's health and safety were at risk. Third, Farm Bureau was not financially vulnerable. However, the fourth and fifth guideposts do apply because Defendants took repeated actions as part of a fairly lengthy and complicated scheme to lure the agents away from Farm Bureau, and Defendants' actions showed a certain amount of deceit.

        b.      <u>Disparity Between Actual Harm and Punitive Damages Award</u>

The jury found that $3,606,214 reflected the amount of Farm Bureau's actual harm. The punitive damage award was $62,722,000. The difference in the two amounts is extreme no matter which ratio the court would find reasonable.

18

c.      The *Crookston* Factors

Because the first three of the Utah Supreme Court's <u>Crookston</u> factors (the nature of the alleged misconduct; the facts and circumstances surrounding such conduct; and the amount of actual damages awarded) are parallel to the federal <u>Gore</u> factors applied in the analysis above, those factors need not be independently evaluated here.  Accordingly, the court now turns to the remaining four <u>Crookston</u> factors.

i.      The Relative Wealth of the Defendants

While the evidence showed that American National Insurance Company has a substantial net worth, Farm Bureau presented no evidence of the net worth of the other two corporate Defendants.  Mr. Gallacher's net worth is less than half a million dollars and Mr. Ivie has a negative net worth.

ii.      The Effect of the Conduct on the Lives of Farm Bureau and Others

Although Defendants' actions caused Farm Bureau to lose agents, in light of the fact that Farm Bureau carried on its business, apparently successfully, the impact of Defendants' actions on Farm Bureau was not "devastating." <u>See</u> <u>Smith v. Fairfax,</u> 82 P.3d 1064, 1074, (Utah 2003) (despite fact that defendant's misconduct caused plaintiffs to lose partnership interests in real estate venture, court said that impact was not "devastating.").

iii.      The Probability of Future Recurrences of the Misconduct

Nothing in the record indicates that Defendants will engage in this type of conduct again.

iv.      The Relationship of the Parties

Mr. Ivie owed Farm Bureau a duty of loyalty and a fiduciary duty.  The other Defendants knew of the duties owed by Mr. Ivie, yet, as the jury found, they induced Mr. Ivie to violate those

duties.  Still, no special relationship existed between the other Defendants and Farm Bureau.

After considering the relevant evidence and the law, the court concludes that an award equal to the amount of compensatory damages is in line with both the state and federal guideposts.  Most significant to the court's conclusion is the large amount of compensatory damages awarded by the jury.  The U.S. Supreme Court noted that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.  The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003).  Moreover, as discussed above, the Defendants' actions were not sufficiently reprehensible to justify a larger punitive damages award.

For the above-stated reasons, the court reduces the punitive damages award against each individual Defendant based on the same proportion awarded by the jury in its verdicts (e.g., the initial $15,000,000 in punitive damages assessed against American National Property and Casualty Company was 23.92% of the overall $62,722,000 punitive damages award, so now American National Property and Casualty Company is assessed 23.92% of the new overall punitive damages award).  Specifically, the punitive damage awards are reduced to the following amounts: American National General Insurance owes $431,214.01 (11.96%);  American National Property & Casualty owes $862,428.02 (23.92 %);  American National Insurance Company owes $2,156,070.04 (59.78%);  Darrin Ivie owes $18,513.45 (0.51%); and Kenneth Gallacher owes $137,988.48 (3.83%).

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1.      Defendant American National Property & Casualty's and American National General Insurance Company's Motion for Remittitur or Alternative Motion for New Trial (Dkt # 541) is GRANTED IN PART AND DENIED IN PART.

2.      Defendant American National Property & Casualty's and American National General Insurance Company's Combined Motions (i) for Judgment as a Matter of Law, (ii) For New Trial, and (iii) For a Remittitur (Dkt # 542) is GRANTED IN PART AND DENIED IN PART.

3.      Defendants American National Insurance Company's, Kenneth Gallacher's, and Darrin Ivie's Motion for Judgment as a Matter of Law or, in the Alternative, a New Trial (Dkt # 557 and Dkt # 558) is DENIED.

4.      The jury's punitive damages award is reduced as follows:  American National General Insurance owes \$431,214.01 (11.96%);  American National Property & Casualty owes \$862,428.02 (23.92 %);  American National Insurance Company owes \$2,156,070.04 (59.78%); Darrin Ivie owes \$18,513.45 (0.51%); and Kenneth Gallacher owes \$137,988.48 (3.83%).

DATED this 11th day of February, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

21